1  Christopher Sproul (State Bar No. 126398)
   Jodene Isaacs (State Bar No. 226895)
2  ENVIRONMENTAL ADVOCATES
   5135 Anza Street
3  San Francisco, California 94121
   Telephone: (415) 533-3376, (510) 847-3467
4  Facsimile: (415) 358-5695
   Email:  csproul@enviroadvocates.com
5  Email:  jisaacs@enviroadvocates.com

6  Fredric Evenson (State Bar No. 198059)
   ECOLOGY LAW CENTER
7  ~Monterey Bay~
   P.O. Box 1000
8  Santa Cruz, CA 95061
   Telephone: (831) 454-8216
9  Email: evenson@ecologylaw.com

10 Attorneys for Plaintiff
   ECOLOGICAL RIGHTS FOUNDATION

11             UNITED STATES DISTRICT COURT
12            NORTHERN DISTRICT OF CALIFORNIA

13 ECOLOGICAL RIGHTS FOUNDATION,

14                Plaintiff,                    Civil Case No.

15            v.                                COMPLAINT FOR DECLARATORY
                                                AND INJUNCTIVE RELIEF AND
16 SCHMIDBAUER LUMBER, INC. and                 CIVIL PENALTIES
   SCHMIDBAUER BUILDING SUPPLY, LLC
17                                              DEMAND FOR JURY TRIAL

18                Defendants.                   (Federal Water Pollution Control
                                                Act, 33 U.S.C. §§ 1251 et. seq.)
19

20

21

22

23

24

25

26

27

28

Ecological Rights Foundation ("EcoRights"), by and through its counsel, hereby alleges:

## I.  JURISDICTION AND VENUE

1.  This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.  On October 10, 2016, EcoRights provided notice of violations of the CWA occurring at the Schmidbauer facility located at 1099 Waterfront Drive, Eureka, California ("the Facility"), Waste Discharger Identification number ("WDID") 1121001233, and of EcoRights' intention to file suit against Schmidbauer Lumber, Inc. and Schmidbauer Building Supply, LLC (collectively "Schmidbauer") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 1 ("Regional Board"); the U.S. Attorney General, and the Defendants ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A copy of this Notice Letter is attached to this complaint as Exhibit 1.

3.  More than sixty days have passed since notice was sent to Schmidbauer and the state and federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.  Venue is proper in the Northern District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the source of the violations is located within this judicial district.

## II.  INTRADISTRICT ASSIGNMENT

5.     Intradistrict assignment of this matter to the San Francisco Division or Humboldt Division of the Court is appropriate pursuant to Civil Local Rule 3-2(c). The events and the property at issue which give rise to EcoRights' claims occurred in Eureka, Humboldt County, California. However, Defendant's counsel is located in Santa Barbara, and Plaintiff's counsel is located in the greater San Francisco Bay Area. Thus, it would likely be most convenient for the parties if this case were assigned to the San Francisco Division of the Court.

### III.   **INTRODUCTION**

6.     This complaint seeks relief for alleged unlawful discharges of pollutants from Schmidbauer's facility located at 1099 Waterfront Drive, Eureka, California into waters of the United States in violation of the Clean Water Act, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, adopted by California State Water Resources Control Board ("SWRCB"), Water Quality Order No. 2014-0057-DWQ ("2015 Industrial Storm Water Permit" or " WQO-2014-0057-DWQ"), which became effective July 1, 2015, and the previous version of the Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ ("1997 Industrial Storm Water Permit" or "WQO-97-03-DWQ").

7.     Violations of the Clean Water Act and the Industrial Stormwater Permit by small industrial sites are recognized as a leading cause of significant, cumulative impacts to water quality. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow off of local industrial facilities, such as Schmidbauer's, and pour into storm drains, rivers, and the ocean. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the marine environment each year.

8.     Stormwater runs off of industrial sites such as Schmidbauer's, causing harm to humans and aquatic life. In particular, stormwater from such industrial facilities contains suspended sediment and chemicals that are potentially significant to the beneficial uses of Humboldt Bay.

9.     The Schmidbauer Facility is an active lumber mill, and according to the current Stormwater Pollution Prevention Plan ("SWPPP"), facility operations include log and lumber storage, debarking, bucking, milling, planing, applying anti-sapstain chemicals, wood byproduct recovery, lumber shipping, sawmill, vehicle, and equipment fueling, and maintenance. The facility has a boiler and

1  dry wood waste (referred to as "hog fuel") is burned in the boiler to generate steam for heating
2  lumber frying kilns.

3      10.    After Schmidbauer purchased the Facility in 1972, it began treating lumber with Noxtane,
4  a wood treatment chemical. Noxtane contains pentachlorophenol ("PCP") and tetrachlorophenol
5  ("TCP"), and was used at the site until 1983. Until they were banned by the U.S. EPA in the late
6  1980's due to their extreme toxicity, chlorophenolic wood treatment chemicals were widely used at
7  lumber mills. The chemicals themselves, pentachlorophenol and tetrachlorophenol, are known
8  carcinogens, but even more problematic is the fact that chlorophenolic wood treatment products are
9  invariably contaminated with polychlorinated dibenzo-p-dioxins ("dioxins") and polychlorinated
10  dibenzofurans ("furans"). Dioxins and furans are widely recognized by the U.S. Environmental
11  Protection Agency, the World Health Organization, and other governmental and nongovernmental
12  organizations as among the most potent toxins known to humankind. Even in minute quantities,
13  dioxins can cause cancer, mutations, developmental abnormalities, or fatalities in exposed human,
14  animal, and plant populations. Dioxins and furans are also extremely persistent in the environment,
15  with some congeners having half-lives measured in decades. Soils contaminated with dioxins and
16  furans are still present at the sites of many historic lumber mills throughout the nation, where sloppy
17  use and improper disposal practices led to widespread contamination of soils, sediments, and
18  groundwater. Such contaminated soils and sediments pose significant risks to human health and the
19  environment as they are widely dispersed into the environment by rainwater runoff, wind, and
20  vehicle traffic.

21      11.    Discharges of stormwater and non-stormwater from lumber facilities such as
22  Schmidbauer's are also of significant concern because the industrial activities associated with these
23  sites make various pollutants particularly accessible to stormwater. The Schmidbauer Facility
24  currently has 18 hazardous materials storage areas. Specifically, the Schmidbauer Facility stores
25  thousands of gallons of propane, oil, diesel fuel, gasoline, grease, coolant, boiler chemicals,
26  compressed gases such as acetylene, nitrogen, argon, carbon dioxide and oxygen, and sapstain
27  control chemicals such as propiconazole.

28      12.    "Wood yard leaching" occurs when the by-products of chemical and biological

decomposition of wood materials are carried away by water, potentially causing adverse impacts to surface waters and/or groundwater. The soluble or misable products of wood leaching include tannins, lignins, turpins, high chemical oxygen demand and biochemical oxygen demand, and in some cases "black liquor" from fermentation.

13.   The large number of vehicles and amount of lumber entering and leaving the Facility track oil, grease, wood treatment chemicals, lumber debris, and other pollutants off-site and onto roads where rainfall washes these pollutants into the storm drain system or directly into waters of the United States. Motor oil detected in the Kiln Ditch in 2015 was attributed to frequent passage of forklifts and loaders used for debarking in the area, one of which had an oil leak. According to the facility's 2010 Stormwater Monitoring Plan – which discussed that the same problem plagued the facility as far back as 2010 – loaders drive back and forth up to 18 hours a day at the Facility. In 2013, exceedances of Total Suspended Solids ("TSS") in the Kiln Ditch were also attributed to heavy traffic throughout the area. Correspondence from 2014 also estimated that the exceedance of oil levels in samples from the Kiln Ditch was likely attributable to a chip or shavings truck with a leak.

14.   High concentrations of TSS degrades optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and PAHs, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

15.   Storm water also comes into contact with logs and lumber stored alongside ditches. This is problematic because lumber is treated with chemicals such as Propiconazole, which was detected in the West Ditch. Propiconazole is a fungicide, antimicrobial pesticide, and materials preservative. Propiconazole is considered highly toxic to freshwater fish and estuarine/marine invertebrates, moderately toxic to estuarine/marine fish, and slightly toxic to mammals and freshwater invertebrates. A 2013 risk assessment completed by the EPA concluded that increased use of

propiconazole as a fungicide carried the potential for acute risk to listed estuarine/marine invertebrates. The EPA-approved label for propiconazole technical products states:

> This product is toxic to fish. Do not apply directly to water, to areas where surface water is present, or to intertidal areas below the mean high Water mark. Do not contaminate water by cleaning of equipment or disposal of wastes. Do not discharge effluent containing this product into lakes, streams, ponds, estuaries, oceans, or other waters, unless in accordance with the requirements of a National Pollutant Discharge Elimination System (NPDES) permit and the permitting authority has been notified in writing prior to discharge. Do not discharge effluent containing this product to sewer systems without previously notifying the local sewage, treatment plant authority. For guidance, contact your State Water Board or Regional Office of the EPA.

16.   Schmidbauer's stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of industrial stormwater permits that EcoRights is seeking to eliminate or reduce. These pollution discharges can and must be curtailed to ensure the ecological health of the Humboldt Bay.

## IV.   PARTIES

17.   EcoRights is a non-profit public benefit corporation organized under the laws of California, with its main office in Garberville, California. EcoRights' purpose is to educate the public about environmental practices which cause harm to human health, the environment and other natural resources, and to seek redress from those harms through litigation or alternative dispute resolution. EcoRights represents citizens in protecting California's waterways from pollution, securing the multitude of benefits that flow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial fishing, tourism, and other commercial activities that depend on clean water. To further its goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

18.   Members of EcoRights, including citizens, taxpayers, property owners, and residents,

1   live, work, travel and recreate near the Humboldt Bay, into which Schmidbauer causes pollutants

2   to be discharged. These EcoRights members use and enjoy the impacted waters for recreational,

3   educational, scientific, conservation, aesthetic, and spiritual purposes. Schmidbauer's alleged

4   discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of

5   EcoRights' members have been, are being, and will continue to be adversely affected by

6   Schmidbauer's failure to comply with the Clean Water Act and the Industrial Stormwater Permit.

7       19.    Schmidbauer Lumber, Inc. and Schmidbauer Building Supply, LLC are the owner,

8   corporate parent of, or otherwise exercise control over the Facility located at 1099 Waterfront

9   Drive, Arcata California. Schmidbauer Lumber, Inc. and Schmidbauer Building Supply, LLC are

10  actively registered with the California Secretary of State. Schmidbauer staff who are located at the

11  facility at 1900 Waterfront Drive, Eureka, California submit most reporting required under the

12  Industrial Stormwater Permit.

13      20.    Through its various corporate and subsidiary entities, Schmidbauer operates the Facility

14  where it stores logs and lumber, applies anti-sapstain chemicals, and conducts debarking, bucking,

15  milling, planing, wood byproduct recovery, lumber shipping, sawmill, vehicle, and equipment

16  fueling, and maintenance.

17  **V.    REGULATORY BACKGROUND**

18         **Clean Water Act**

19      21.    CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into

20  waters of the United States unless the discharge is in compliance with various enumerated CWA

21  sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in

22  violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit

23  issued pursuant to CWA section 402, 33 U.S.C. § 1342.

24      22.    CWA section 402(p) requires that NPDES permits be issued for stormwater discharges

25  associated with industrial activities.

26      23.    CWA section 402(b) allows each state to administer its own EPA-approved permit

27  program for discharges. In California, the State Board and its nine Regional Boards have approval

28  from EPA to administer an NPDES permit program for the State. The State Board and its nine

Regional Boards issue individual and general NPDES permits regulating water pollutant

discharges from various categories of dischargers.

24.   CWA section 505(a)(1) provides for citizen enforcement actions against any "person,"

including individuals, corporations, or partnerships, for violations of NPDES permit requirements

and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

25.   The CWA provides that "the discharge of any pollutant by any person shall be unlawful"

unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33

U.S.C. § 1311(a); see also CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance

for the discharge of stormwater associated with industrial activities). The Facility discharges

stormwater associated with industrial activity to the Humboldt Bay, and that stormwater is

contaminated with pollutants. The Facility has discharged and continues to discharge stormwater

pursuant to the 1997 and 2015 Industrial Stormwater Permits, which authorize these discharges

conditioned on the Facility complying with the terms of these permits. Each of these permit terms

constitutes an "effluent limitation" within the meaning of CWA § 505(f), 33 U.S.C. § 1365(f). The

Facility's stormwater discharges have violated various of these permit terms, thereby violating

CWA effluent limitations. CWA section 505(a) authorizes a citizen suit action for injunctive relief.

33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to

$32,500 for all violations occurring on or after March 15, 2004 through January 12, 2009, $37,500

per day per violation for violations occurring between January 12, 2009 and December 6, 2013,

and $37,500 per violation for violations occurring after December 6, 2013. CWA § 309(d), 33

U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4.

**State Regulations**

26.   The Regional Board's Basin Plan is the master policy document setting forth the legal,

technical, and programmatic bases of water quality regulation in the Region. Among other things,

the Basin Plan includes the water quality objectives needed to protect the designated beneficial

water uses. The Basin Plan sets forth narrative water quality objectives for sediment, settable

matter, and suspended materials, as well as narrative objectives for not impairing water quality

with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also includes numeric

water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objective for certain pollutants of concern such as copper, lead, and zinc. The Basin Plan, Section 3, establishes the following relevant Water Quality Standards (also known as Water Quality Objectives) for the Humboldt Bay[1]:

    a.    Controllable water quality shall conform to the water quality objectives contained therein.

    b.    Dissolved oxygen levels shall be a minimum of 6.0 mg/L [6,000 ug/L].

    c.    The suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses.

    d.    Waters shall not contain substances in concentrations that result in deposition of material that causes nuisance or adversely affect beneficial uses.

    e.    Turbidity shall not be increased more than 20 percent above naturally occurring background levels.

    f.    Waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses.

    g.    Waters shall be free of coloration that causes nuisance or adversely affects beneficial uses.

    h.    Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

    i.    Changes in normal ambient pH levels shall not exceed 0.2 units in waters with designated marine or saline beneficial uses.

    j.    All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life.

---

[1] The Basin Plan is published by the California North Coast Regional Water Quality Control Board at http://www.waterboards.ca.gov/northcoast/water_issues/programs/basin_plan/basin_plan.shtml.

k.      No individual pesticide or combination of pesticides shall be present in concentrations that adversely affect beneficial uses. There shall be no bioaccumulation of pesticide concentrations found in bottom sediments or aquatic life.

27.    Discharges of stormwater from the Facility have caused or contributed to an exceedance of the above-listed Water Quality Standards. These discharges (and all discharges referred to in the Notice Letter attached as Exhibit 1) have occurred at each of the discharge locations identified in Schmidbauer's Annual Reports to the State Board and SWPPP.

28.    Exhibit 1 (i.e. the Notice Letter and its Attachment 1) compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of stormwater discharges. The sample results reflected in Exhibit 1, Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Schmidbauer did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. As reflected in Attachment 1, the Facility's stormwater discharges to the Humboldt Bay have consistently contained elevated levels of the following pollutants: TSS, Zinc, Total Organic Carbon ("TOC"), Chemical Oxygen Demand ("COD"), and Specific Conductance ("SC"). Arsenic, chromium, and copper have also been detected in stormwater discharges at the Facility. Schmidbauer has exceeded the EPA benchmark for copper on at least one occasion. Significant amounts of Propiconazole as well as tannins and lignins have also been detected in discharges.

29.    Schmidbauer has not consistently tested for oil and grease as required by the 1997 and 2015 permits, despite having admitted to a longstanding problem containing oil and grease levels in stormwater discharges at the Facility in its correspondence with the State Board. Instead, Schmidbauer tested for other total hydrocarbon parameters, referred to variously in sampling data as "motor oil", "TPHC", "TPHC as motor oil", and/or "TPHC as diesel."

30.    The excessive TSS in the Facility's stormwater discharges has caused or contributed and is continuing to cause or contribute to the Humboldt Bay not meeting the Water Quality Standards Nos. 3, 5, and 8 set forth in the Basin Plan. Furthermore, the Facility's discharge of stormwater

1 containing suspended and settleable toxic metals and other materials has contributed to the

2 deposition and/or dispersal of materials that interfere with beneficial uses of the Humboldt Bay

3 and a detrimental increase in concentrations of toxic substances found in bottom sediments or

4 aquatic life due to bioaccumulation, and thus has caused or contributed and is continuing to cause

5 or contribute to the Humboldt Bay not meeting the Water Quality Standards Nos. 3 through 11 set

6 forth in the Basin Plan. The Facility's discharge of COD has caused or contributed and is

7 continuing to cause or contribute to the Humboldt Bay not meeting applicable Water Quality

8 Standards No. 2 in the Basin Plan for dissolved oxygen.

9      31.    In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR")

10 sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes,

11 enclosed bays, and estuaries.[2] The CTR, which applies to Humboldt Bay, includes limits for

12 several toxic metals.

**The General Industrial Stormwater Permit**

13      32.    In California, the State Board has elected to issue a single, statewide general permit

14 applicable to all stormwater discharges associated with industrial activity. The Industrial

15 Stormwater Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p). To

16 discharge stormwater lawfully in California, industrial dischargers must secure coverage under the

17 Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual

18 NPDES permit.

19      33.    The Discharge Prohibitions of the 1997 and 2015 Industrial Stormwater Permits prohibit

20 stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. WQO-

21 97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C. The Receiving Water Limitations of the 1997

22 and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that cause or

23 contribute to an exceedance of any applicable Water Quality Standards in any affected receiving

24 water. WQO-97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A. Applicable Water Quality

25 Standards are set forth in the Basin Plan and the CTR.

26

27

28

---

[2] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682.

34.    The Receiving Water Limitations of the 1997 and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that adversely impact human health or the environment. WQO-97-03-DWQ § C.1; WQO-2014-0057-DWQ § VI.B.

35.    The Receiving Water Limitations and Discharge Prohibitions of the 1997 and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that contain pollutants in quantities that threaten to cause pollution or a public nuisance. WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § VI.C.

36.    Dischargers must ensure that a Stormwater Pollution Prevention Plan ("SWPPP") is prepared in order to identify and evaluate all sources of pollutants that may affect the quality of industrial storm water discharges and authorized non-stormwater discharges ("NSWDs"). WQO-2014-0057-DWQ §§ X.C.1.A, X.G.2; WQO-97-03-DWQ §§ A.6, A.7.

37.    The SWPPP must describe each industrial process and the "type, characteristics, and approximate quantity of industrial materials used in or resulting from" industrial processes. WQO-2014-0057-DWQ § X.G.1.A; WQO-97-03-DWQ § A.6.a.i. Dischargers must also ensure that the SWPPP describes all activities that generate a significant amount of dust, particulates, or other pollutants that may be deposited within the facility boundaries, including the locations, sources, and characteristics of the dust or particulate pollution. WQO-2014-0057-DWQ § X.G.2; WQO-97-03-DWQ § A.6.

38.    For facilities that discharge to impaired waters, the SWPPP must identify pollutants at their facility that may be causing or contributing to an exceedance of a water quality standard in the receiving waters. WQO-2014-0057-DWQ § X.G.2. Based on the potential pollutant assessment, the SWPPP must further identify any areas of the facility where the minimum BMPs will not adequately reduce or prevent pollutants. WQO-2014-0057-DWQ § X.G.2; WQO-97-03-DWQ § A.6.

**VI.    STATEMENT OF FACTS**

39.    In most of the Humboldt Bay area, stormwater drains untreated either directly, or through the storm drain system, into the Bay and its tributaries. Among those who specialize in the field of water quality locally, it is well known and commonly understood that stormwater pollution

accounts for the majority of pollution entering the Humboldt Bay and its watershed each year. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from area industries, pour into the Bay and its tributaries.

40.    Schmidbauer operates the Facility located at 1099 Waterfront Drive, Eureka in Humboldt County.

41.    Activities at the Facility include the processing and treatment of lumber, including treating lumber with anti-sapstain pesticides and fungicides, storing large piles of treated and untreated lumber throughout the site, debarking, bucking, milling, planing, wood byproduct recovery, lumber shipping, sawmill, vehicle, and equipment fueling, and maintenance. Discharges of stormwater flow off the Facility at least five different discharge points and ultimately into the Humboldt Bay.

42.    The operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall. At the Facility, materials are stored outdoors in large piles open to wind and storm water flows. Schmidbauer's Facility generates large amounts of wood waste, sawdust, and other particulate matter which settle on the ground and other surfaces which are exposed to storm water and non-storm water flows. The Facility lacks sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater on the Facility. Schmidbauer does not sufficiently treat contaminated stormwater prior to discharge from the Facility. The large number of trucks entering and leaving the Facility also track dirt, metals, oil, grease, and other pollutants off-site and onto public roads and drainage pathways where rainfall washes these pollutants into the storm drain system or directly into waters of the United States.

43.    The types of pollutants that the Facility releases into the immediate environment include, among others: TSS, Zinc, Total Organic Carbon ("TOC"), Chemical Oxygen Demand ("COD"), and Specific Conductance ("SC"). Arsenic, chromium, and copper have also been detected in the Facility's stormwater discharges. The Facility exceeded the EPA benchmark for copper on at least one occasion. Significant amounts of Propiconazole as well as tannins and lignins have also been detected in discharges. The industrial materials stored, and the pollutants generated, at the Facilities are exposed to stormwater flows.

44.   Portions of the Facility are unpaved. Thus, pollutants from Schmidbauer's activities can soak into unpaved ground and later become mobilized in stormwater flows.

**Activities Contributing to CWA Violations**

45.   Schmidbauer has not developed and/or implemented an adequate SWPPP at the Facility.

46.   Schmidbauer has not implemented BMPs that adequately minimize the exposure of pollutants at the Facility to stormwater.

47.   Schmidbauer has not implemented BMPs at the Facility that adequately control and minimize contaminated runoff from the facility.

48.   Schmidbauer has not implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

49.   Schmidbauer has not adequately evaluated and revised its SWPPP for the Facility to address these failures. Schmidbauer has also failed to fully implement its SWPPP and properly operate and maintain the structures and systems that have been put in place to achieve compliance with the 1997 and 2015 Industrial Stormwater Permits and SWPPP requirements.

50.   Schmidbauer has not developed and/or implemented an adequate MRP at the Facility.

51.   Schmidbauer's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging into stormwater flows from the Facility.

52.   Schmidbauer has failed to complete all of the stormwater sampling required by the 1997 and 2015 Industrial Stormwater Permits at the Facility.

53.   Schmidbauer's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revision of each its SWPPP.

54.   Due to Schmidbauer's lack of effective pollution prevention measures, its failure to implement effective best management practices, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. Dust, toxic metals such as arsenic, chromium, copper, iron, and zinc; TSS, oil, grease, and pH-affecting substances become entrained in stormwater when such water flows over and across the outdoor processing areas of the Facility. This polluted stormwater is discharged to the Humboldt Bay.

55.    Schmidbauer's own stormwater sampling indicates that Schmidbauer's discharges of stormwater from the Facility is consistently contaminated with higher levels of pollutants than is permissible under the Industrial Stormwater Permit.

## VII.  CLAIMS

### FIRST CLAIM FOR RELIEF

**Discharges of in Violation of Technology-Based Effluent Limitations**
**(Violations of 33 U.S.C. § 1311)**

56.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

57.    The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Facility discharges stormwater associated with industrial activity to Humboldt Bay that is contaminated with pollutants. The Facility's past and present stormwater discharges are subject to the 1997 and 2015 Industrial Stormwater Permits, which authorize these discharges conditioned on the Facility complying with the terms of those permits. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). The Facility's stormwater discharges have violated numerous of these permit terms, thereby violating CWA effluent limitations.

58.    The Effluent Limitations of the 1997 and 2015 Industrial Stormwater Permits prohibit Schmidbauer from discharging pollutants above the level commensurate with the application of BAT and BCT. WQO-97-03-DWQ § B.3; WQO-2014-0057-DWQ §§ V.A., X.H.1, X.H.2; (see also WQO-2014-0057-DWQ, Industrial General Permit Fact Sheet § D.1-5.)

59.    On every day prior to July 1, 2015 that Schmidbauer discharged stormwater from the Facility, it was in violation of the 1997 Industrial Stormwater Permit's Receiving Water Limitations and Discharge Prohibitions set forth at WQO-97-03-DWQ §§ A.2, C.1, & C.2 by causing or contributing to exceedances of water quality standards. Each day after July 1, 2015 that

1   Schmidbauer discharged stormwater from the Facility, it acted in violation of the 2015 Industrial
2   Stormwater Permit's Receiving Water Limitations set forth at WQO-2014-0057-DWQ §§, VI.A.,
3   B. & C by causing or contributing to exceedances of water quality standards and causing pollution
4   problems as described above. Schmidbauer has been discharging polluted stormwater from the
5   Facility containing levels of pollutants above the level commensurate with the application of BAT
6   and BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit during every
7   significant rain event (defined by the U.S. EPA as a rainfall event generating 0.1 inches or more of
8   rain). Significant local rain events are reflected in the rain gauge data available at
9   http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html.  Attachment 2 to the Notice
10  Letter, i.e. Exhibit 1 to this complaint, sets forth a table reflecting the rainfall data for the past five
11  years, as reported to the Woodley Island, Eureka Station, the closest monitoring station available
12  on the NOAA website.

13      60.    The EPA and the State Board have published Benchmark Values set at the maximum
14  level of pollutant loading generally expected if an industrial facility is employing BAT and BCT
15  (which are set forth in Attachment 1 to Exhibit 1). As reflected in Attachment 1 to Exhibit 1, the
16  Facility has repeatedly discharged stormwater from each of the discharge locations identified in
17  Defendants' Annual Reports containing pollutant levels exceeding Benchmark Values, which
18  establishes that the Facility has discharged pollutants above a level commensurate with application
19  of BAT and BCT. Attachment 1 compiles some of the self-monitoring data reported by the Facility
20  to the Regional Board reflecting the Facility's sampling of actual stormwater discharges, as well as
21  samples taken by others from the Facility. The sample results reflected in Attachment 1 are
22  representative of the pollutant levels in the Facility's discharge of stormwater, including such
23  discharges that Schmidbauer did not sample or analyze. Thus, every instance when the Facility has
24  discharged stormwater, including instances when the Facility has discharged stormwater that it has
25  not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels
26  set forth in Attachment 1.

27      61.    EcoRights representatives have observed turbid, brown-tinged stormwater discharges
28  from the Facility on numerous occasions. BAT and BCT levels of treatment at the Facility would

necessarily be sufficient to prevent the discharge of discolored, turbid wastewater that appears to contain elevated levels of TSS and/or oil and grease. Thus, the presence of such discoloration in the stormwater discharges further establishes that Schmidbauer has discharged and is continuing to discharge stormwater that is not treated to a level commensurate with application of BAT and BCT. EcoRights alleges that the stormwater discharges EcoRights observed on this day is representative of the stormwater discharges generally and thus every day Schmidbauer has discharged stormwater (*i.e.*, during every significant rain event), Schmidbauer has discharged stormwater with levels of pollutants exceeding that which would be present if Schmidbauer employed BAT and BCT treatment.

62.    EcoRights further alleges that on each day that Schmidbauer has discharged stormwater, Schmidbauer has discharged stormwater that was not treated to a level commensurate with BAT or BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit because, as further alleged in the Third Claim, below, Schmidbauer has not developed and implemented a SWPPP that mandates BMPs that are commensurate with BAT and BCT for the Facility. WQO-97-03-DWQ § B.3; WQO-2014-0057-DWQ §§ V.A., X.H.1, X.H.2.

63.    Unlawful discharges of stormwater from the Facility with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently and will occur in the future during all significant rain events.

64.    Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Industrial Stormwater Permit's Effluent Limitations and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Schmidbauer has discharged or will discharge polluted stormwater from the Facility in violation of the Effluent Limitations of the Industrial Stormwater Permit, WQO-97-03-DWQ § B.3; WQO-2014-0057-DWQ §§ V.A., X.H.1, X.H.2, is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Schmidbauer to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

1

## SECOND CLAIM FOR RELIEF

2

**Discharges of in Violation of Water Quality-Based Effluent Limitations
(Violations of 33 U.S.C. § 1311)**

3

4      65.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as though

5    fully set forth herein.

6      66.    The Discharge Prohibitions of the 1997 and 2015 Industrial Stormwater Permits prohibit

7    stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. WQO-

8    97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C. The Receiving Water Limitations of the 1997

9    and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that cause or contribute

10   to an exceedance of any applicable Water Quality Standards in any affected receiving water. WQO-

11   97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A. The Receiving Water Limitations of the 1997

12   and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that adversely impact

13   human health or the environment. WQO-97-03-DWQ § C.1; WQO-2014-0057-DWQ § VI.B. The

14   Receiving Water Limitations or the Discharge Prohibitions of the 1997 and 2015 Industrial

15   Stormwater Permits also prohibit stormwater discharges that contain pollutants in quantities that

16   threaten to cause pollution or a public nuisance. WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ

17   § VI.C.

18     67.    Applicable Water Quality Standards are set forth in the Basin Plan and the CTR.

19     68.    The Basin Plan, *inter alia*, establishes the following Water Quality Standards for the

20   Humboldt Bay:

21         a.      Controllable water quality shall conform to the water quality objectives

22       contained therein.

23         b.      Dissolved oxygen levels shall be a minimum of 6.0 mg/L [6,000 ug/L].

24         c.      The suspended sediment load and suspended sediment discharge rate of

25       surface waters shall not be altered in such a manner as to cause nuisance or adversely

26       affect beneficial uses.

27         d.      Waters shall not contain substances in concentrations that result in deposition

28       of material that causes nuisance or adversely affect beneficial uses.

e.      Turbidity shall not be increased more than 20 percent above naturally occurring background levels.

f.      Waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses.

g.      Waters shall be free of coloration that causes nuisance or adversely affects beneficial uses.

h.      Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

i.      Changes in normal ambient pH levels shall not exceed 0.2 units in waters with designated marine or saline beneficial uses.

j.      All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life.

k.      No individual pesticide or combination of pesticides shall be present in concentrations that adversely affect beneficial uses. There shall be no bioaccumulation of pesticide concentrations found in bottom sediments or aquatic life.

69.   Schmidbauer's discharges of stormwater from the Facility from each of the five discharge locations ("outfalls") identified in Schmidbauer's Annual Reports have caused or contributed to an exceedance of one or more of the above-listed Water Quality Standards. Attachment 1 to Exhibit 1 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of stormwater discharges. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Schmidbauer did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that Schmidbauer has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. Attachment 1 indicates that the Facility routinely discharges stormwater into the Humboldt Bay containing,

1    *inter alia*, the following pollutants: TSS, Zinc, TOC, COD, and SC. Arsenic, chromium, and

2    copper have also been detected in the Facility's stormwater discharges and Schmidbauer has

3    exceeded the EPA benchmark for copper on at least one occasion. Significant amounts of

4    Propiconazole as well as tannins and lignins have also been detected in discharges.

5        70.   Schmidbauer has not consistently tested for oil and grease as required by the 1997 and

6    2015 Industrial Stormwater Permits in its discharges, despite having admitted to a longstanding

7    problem containing oil and grease levels in stormwater discharges at the Facility in its

8    correspondence with the State Board. Instead, Schmidbauer has tested for other total hydrocarbon

9    parameters, referred to variously in Schmidbauer's sampling data as "motor oil", "TPHC",

10   "TPHC as motor oil", and/or "TPHC as diesel."

11       71.   The levels of these pollutants in the Facility's stormwater discharges have caused

12   pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the Industrial

13   Stormwater Permit, WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C, and have

14   adversely impacted the environment in violation of the Receiving Water Limitations of the

15   Industrial Stormwater Permit, WQO-97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A.

16   Moreover, the discharge of these pollutants has caused the Humboldt Bay not to attain or

17   contributed to these waters not attaining one or more applicable Water Quality Standards in

18   violation of the Receiving Water Limitations of the Industrial Stormwater Permit, WQO-97-03-

19   DWQ § C.2; WQO-2014-0057-DWQ § VI.A.

20       72.   Specifically, the Facility's discharge of stormwater containing suspended and settleable

21   toxic metals, oil, grease, and other materials has contributed to the deposition and/or dispersal of

22   materials that interfere with beneficial uses of the Humboldt Bay and a detrimental increase in

23   concentrations of toxic substances found in bottom sediments or aquatic life due to

24   bioaccumulation, and thus has caused or contributed and is continuing to cause or contribute to

25   the Humboldt Bay not meeting the Water Quality Standards Nos. 3 through 11 set forth in the

26   Basin Plan. The Facility's discharge of COD has caused or contributed and is continuing to cause

27   or contribute to the Humboldt Bay not meeting applicable Water Quality Standards No. 2 in the

28   Basin Plan for dissolved oxygen.

73.     Each day that Schmidbauer discharged stormwater from the Facility, Schmidbauer's stormwater contained levels of pollutants matching the levels set forth in Attachment 1 to Exhibit 1 and thus caused levels of pollutants to exceed one or more of the applicable Water Quality Standards in the Humboldt Bay. Every day that the Facility has been in existence since the effective date of the above-referenced Water Quality Standards, which date back at least to 1986 in most instances, and to May 24, 2000 for the California Toxics Rule's limit on zinc, Schmidbauer has discharged stormwater from the Facility during at least every significant local rain event over 0.1 inches that has caused or contributed to Water Quality Standards not being met in the Humboldt Bay. Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html, and, as mentioned above, summarized in Attachment 2.

74.     EcoRights representatives further observed discharges of stormwater from the Schmidbauer Facility that were turbid, murky, and visibly discolored. Schmidbauer's visual observations in Annual Reports from 2009-2015 have also consistently indicated the presence of "dirty", "cloudy", "reddish color[ed]", and "murky" stormwater discharge. However, Schmidbauer has not taken steps to remedy these issues as required by the 1997 and 2015 Industrial Stormwater Permits. Schmidbauer's stormwater discharges cause the Humboldt Bay and its tributaries to fail to meet the Basin Plan's narrative water quality standards mandating that "Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." Basin Plan III-3. EcoRights alleges that the stormwater discharges EcoRights observed are representative of Schmidbauer's stormwater discharges generally and thus every day that Schmidbauer has discharged stormwater, Schmidbauer has discharged stormwater that causes the Humboldt Bay and its tributaries to fail to meet these Basin Plan water quality standards.

75.     The Stormwater discharges referred to in the preceding paragraphs further violate the Discharge Prohibitions of the Industrial Stormwater Permit, WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C, in that these discharges cause or threaten to cause pollution, contamination, or nuisance and further adversely impact human health and environment by polluting the Humboldt Bay with toxic metals and wastewater high in turbidity.

1   76.   Schmidbauer's unlawful discharges from the Facility continue to occur presently and

2   will occur in the future during all significant rain events. Each discharge of stormwater from the

3   Facility after the effective date of the Industrial Stormwater Permit has constituted and will

4   constitute a separate violation of the Discharge Prohibitions of the Industrial Stormwater Permit,

5   WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C, and/or the Receiving Water

6   Limitations of the Industrial Stormwater Permit, WQO-97-03-DWQ § C.2; WQO-2014-0057-

7   DWQ § VI.A, and the CWA. Every day since at least five years and sixty days before the date

8   Plaintiff filed this Complaint that Schmidbauer has discharged or will discharge polluted

9   stormwater from the Facility in violation of Discharge Prohibitions of the Industrial Stormwater

10  Permit and/or the Receiving Water Limitations of the Industrial Stormwater Permit is a separate

11  and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Schmidbauer

12  to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§

13  1319(d) and 1365.

14  ### THIRD CLAIM FOR RELIEF

15  **Failure to Develop and Implement an Adequate Stormwater
    Pollution Prevention Plan**
16  **(Violations of 33 U.S.C. § 1311)**

17  77.   Plaintiffs incorporate the allegations contained in all preceding paragraphs as though

18  fully set forth herein.

19  78.   Schmidbauer has failed to develop and implement an adequate SWPPP or implement all

20  necessary revisions to the SWPPP for the Facility as required by WQO-97-03-DWQ §§ A.1, C.1,

21  WQO-2014-0057-DWQ § X.A-I, § X.B. Schmidbauer has failed to prepare, maintain, revise and

22  implement Schmidbauer's SWPPP as required, as evidenced by stormwater discharges that

23  exceed EPA and State benchmarks and contribute to violations of Water Quality Standards in

24  receiving waters. Schmidbauer's SWPPP does not specify adequate BMPs designed to reduce

25  pollutant discharge to BAT and BCT levels in accord with the SWPPP requirements set forth in

26  the Industrial Stormwater Permit as evidenced by the Facility's continued discharge of

27  stormwater contaminated above pollutant levels attainable via application of BAT and BCT.

28  WQO-97-03-DWQ, § A; WQO-2014-0057-DWQ §§ X.A., X.C., X.H.1, X.H.2.

79.    Both the 1997 and 2015 Industrial Stormwater Permits require dischargers to develop and implement a site-specific SWPPP for each covered industrial facility that contains the following elements: 1. Facility Name and Contact Information; 2. Site Map; 3. List of Industrial Materials; 4. Description of Potential Pollution Sources; 5. Assessment of Potential Pollutant Sources; 6. Minimum BMPs; 7. Advanced BMPs, if applicable; 8. Monitoring Implementation Plan; 9. Annual Comprehensive Facility Compliance Evaluation (Annual Evaluation); and, 10. Date that SWPPP was initially Prepared and the Date of Each SWPPP Amendment, if Applicable. WQO-97-03-DWQ, § A; WQO-2014-0057-DWQ §§ X.A., X.H.1. In addition, after July 1, 2015, the SWPPP must identify and describe any advanced BMPs implemented to reduce or prevent pollutants in industrial stormwater discharges and authorized non-stormwater discharges ("NSWDs"). WQO-2014-0057-DWQ § X.H.2. The SWPPP must further identify and describe conditions or circumstances which may require future revisions to be made to the SWPPP. WQO-2014-0057-DWQ, § X.C.

80.    Prior to July 1, 2015, Schmidbauer's SWPPP failed to comply with the SWPPP requirements in the 1997 Industrial Stormwater Permit and/or Schmidbauer failed to implement its SWPPP. Additionally, Schmidbauer's present SWPPP fails to comply with the SWPPP requirements set forth in the 2015 Industrial Stormwater Permit and/or Schmidbauer has failed since July 1, 2015 to implement its SWPPP.

81.    Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Schmidbauer has failed to draft an adequate SWPPP, and/or to revise, and/or to implement Schmidbauer's SWPPP in violation of the requirements of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Schmidbauer to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

**FOURTH CLAIM FOR RELIEF**

**Failure to Develop and Implement an Adequate
Monitoring and Reporting Program
(Violations of 33 U.S.C. § 1311)**

82.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as though

1 | fully set forth herein.

2 | 83.   Schmidbauer has failed to develop and implement an adequate monitoring and reporting

3 | program ("MRP") and implement all necessary revisions to the MRP at the Facility as required by

4 | the Industrial Stormwater Permit.

5 | 84.   The 1997 Industrial Stormwater Permit required Facility operators to collect and sample

6 | storm water samples during the first storm event of the wet season and at least one other storm

7 | event in the wet season. WQO-97-03-DWQ § B.5(a). Facility operators that did not collect samples

8 | from the first storm event of the wet season were required to explain in the Annual Report why the

9 | first storm event was not sampled. *Id.* The 2015 Industrial Stormwater Permit now requires

10 | dischargers to collect and analyze storm water samples from two (2) qualifying storm events

11 | ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs

12 | within the second half of each reporting year (January 1 to June 30). WQO-2014-0057-DWQ §

13 | XI.B.1.2.

14 | 85.   The 1997 Industrial Stormwater Permit required that the MRP provide for analysis of

15 | stormwater samples for TSS, pH, specific conductance, and total organic carbon ("TOC") or Oil

16 | and Grease. WQO-97-03-DWQ § B.5.c.i. Similarly, the 2015 Industrial Stormwater Permit requires

17 | that the MRP provide for analysis of stormwater samples for TSS, pH, and Oil and Grease. WQO-

18 | 2014-0057-DWQ § XI.B.6. In addition, the 1997 and 2015 Industrial Stormwater Permits required

19 | that the MRP provide for analysis of stormwater samples for the other analytical parameters listed

20 | either in the 1997 Industrial Stormwater Permit under Table D or set out in the 2015 Industrial

21 | Stormwater Permit under Table 1.

22 | 86.   For the SIC code 2421, Sawmills and Planing Mills, General, this includes COD and Zn

23 | and for the SIC code 2491, Wood Preserving, that should be applicable to the Schmidbauer Facility

24 | given its use of wood preserving chemicals and retail sale of fencing and other wood products,

25 | arsenic and copper. WQO-2014-0057-DWQ § XI.B.6, Table 1; WQO-97-03-DWQ § B.5.c.

26 | 87.   However, in addition to the Table D parameters, the 1997 Industrial Stormwater Permits

27 | required that the MRP provide for analysis of toxic chemicals and other pollutants that are likely to

28 | be present in the Facility's stormwater discharges. WQO-97-03-DWQ § B.5.c.  Similarly, the 2015

Industrial Stormwater Permit § XI.B.6 requires facilities to sample for additional parameters that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment (§ X.G.2) which includes "pollutants likely to be present in industrial storm water discharges and authorized NSWDs" (§ X.G.2.a).

88. Schmidbauer's Annual Reports submitted to the Regional Board for the Facility indicate that Schmidbauer has not consistently and/or properly taken and analyzed the required samples. Schmidbauer's current MRP is inadequate because it fails to consistently monitor for pollutants known to or likely to occur in stormwater discharges. For example, in the 2015-2106 wet season Schmidbauer failed to analyze stormwater discharges for chromium, arsenic, and copper despite the fact that all of these pollutants had consistently been found in previous years' samples. Schmidbauer also consistently failed to test for Oil and Grease, propiconazole, and other pollutants it knew or should have known to be present. Schmidbauer also failed to take four samples at each location during the 2015-2016 wet season and failed to take two samples as required during previous years.

89. Furthermore, Schmidbauer's current MRP fails to monitor for other pollutants likely to be present based on the historical industrial activities performed at the Facility. Based on the former industrial uses at the site and general knowledge in the industry, dioxins, furans, PAHs, and other metals are likely to be present in the Facility's stormwater discharges, as treated wood and wood pulp is stored uncovered and outdoors, and wind, rain, trucks, and rolling stock spread runoff from treated wood and wood pulp throughout the Facility into drainage pathways and onto public roads. The 2015 SWPPP acknowledges that stormwater may come into contact with boiler ash particulate matter and yet, Schmidbauer does not test for those constituents. Given the consistently high levels of suspended solids found in the Facility's stormwater and activities described in Schmidbauer's SWPPP, the Facility's discharges are likely to contain wood pulp and its contaminants dioxins, furans, PAHs, and metals. The likelihood of dioxins and furans being present in the Facility's discharges is increased by the fact that from 1972 until 1983, Schmidbauer employed Noxtane, a chlorophenolic wood preservative, at the Facility. Thus, Schmidbauer's MRP is inadequate because it fails to provide for analysis of dioxins, furans,

1 | pentachlorophenol, tetrachlorophenol, hexachlorobenzene, PAHs and metals (including arsenic,
2 | barium, chromium, copper, lead, nickel, and vanadium) in the Facility's stormwater discharges.

3 | 90.   As alleged in the preceding paragraphs, Schmidbauer has not developed and
4 | implemented an adequate MRP. The MRP Requirements of the 1997 and 2015 Industrial
5 | Stormwater Permits require dischargers to develop and implement a facility-specific monitoring
6 | program. WQO-97-03-DWQ §§ B.1, E.3; WQO-2014-0057-DWQ § XI. On each and every day
7 | from April 17, 1997 to June 30, 2015, Schmidbauer was in continuous violation of the 1997
8 | Industrial Stormwater Permit's requirements to develop and implement an adequate MRP. WQO-
9 | 97-03-DWQ §§ B.1, E.3. Further, on each and every day since July 1, 2015, Schmidbauer has
10 | been in continuous violation of the 2015 Industrial Stormwater Permit's requirements to develop
11 | and implement an adequate MRP. WQO-2014-0057-DWQ § XI. Schmidbauer will continue to be
12 | in violation every day that Schmidbauer fails to develop and implement an adequate MRP for the
13 | Facility.

14 | 91.   As further discussed above, Schmidbauer has not submitted accurate and complete
15 | Annual Reports and reports of noncompliance with the 1997 and 2015 Industrial Stormwater
16 | Permits. Therefore, for each Annual Report due from April 17, 1997 to June 30, 2015,
17 | Schmidbauer was in violation of the 1997 Industrial Stormwater Permit's requirements to submit
18 | accurate and complete Annual Reports every day since each of the Annual Reports were due.
19 | WQO-97-03-DWQ § B.14. Further, for each Annual Report due since July 1, 2015, Schmidbauer
20 | was in violation of the 2015 Industrial Stormwater Permit's requirement's to submit accurate and
21 | complete Annual Reports every day since each of the Annual Reports were due. WQO-2014-
22 | 0057-DWQ § XVI.

23 | 92.   Every day since at least five years and sixty days before the date Plaintiff filed this
24 | Complaint that Schmidbauer has failed to prepare and implement an adequate MRP as required
25 | by WQO-97-03-DWQ §§ B.1, E.3 and WQO-2014-0057-DWQ § XI is a separate and distinct
26 | violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Schmidbauer to an
27 | assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and
28 | 1365.

93.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged in Plaintiff's First through Fourth Claims above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Schmidbauer as set forth hereafter.

## VIII. RELIEF REQUESTED

94.    Wherefore, EcoRights respectfully requests this Court to grant the following relief:

a.    Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the Industrial Stormwater Permit and the CWA;

b.    Enjoin Defendants from discharging pollutants from its Facility to the Humboldt Bay;

c.    Enjoin Defendants to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

d. Enjoin Defendants from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

e.    Order Defendants to pay civil penalties of up $ 51,570 per day in accord with CWA Section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4 (2016).

f.    Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

g. Award such other relief as this Court may deem appropriate.

## IX.   DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b), EcoRights demands a jury trial in this matter.

## X.   DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

Based on EcoRights' knowledge to date, pursuant to Civil Local Rule 3-16, the undersigned certifies that, as of this date, other than the named parties, there is no such interest to report.

1

Dated: December 30, 2016                    ENVIRONMENTAL ADVOCATES

2

3

4

5                                          Jodene Isaacs, Attorney for Plaintiff
                                           ECOLOGICAL RIGHTS FOUNDATION
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28